**IN THE UNITED STATES BANKRUPTCY COURT FOR THE
EASTERN DISTRICT OF TENNESSEE**

In re

ERICKA SUE BRANDENBURG
aka RIKKI BRANDENBURG

                Debtor

Case No. 07-32099

PRIME FINANCIAL SERVICES, INC.

                Plaintiff

      v.

ERICKA SUE BRANDENBURG

                Defendant

Adv. Proc. No. 07-3097

**M E M O R A N D U M**

**APPEARANCES**:   VOWELL & ASSOCIATES
                            Donald K. Vowell, Esq.
                            6718 Albunda Drive
                            Knoxville, Tennessee  37919
                            Attorneys for Plaintiff

                            LAW OFFICES OF MAYER & NEWTON
                            John P. Newton, Jr., Esq.
                            1111 Northshore Drive
                            Suite S-570
                            Knoxville, Tennessee  37919
                            Attorneys for Defendant/Debtor

**RICHARD STAIR, JR.
UNITED STATES BANKRUPTCY JUDGE**

This adversary proceeding is before the court upon the Complaint filed by the Plaintiff, Prime Financial Services, Inc., on October 4, 2007, as amended on September 25, 2008, asking the court to award it a money judgment together with a determination that the judgment is nondischargeable under 11 U.S.C. § 523(a)(2), (4), and/or (6) (2006). After several continuances, the trial, originally scheduled for August 25, 2008, was held on January 31, 2011.[1] The record before the court consists of forty-nine exhibits introduced into evidence, the deposition and video testimony of Joseph Brandenburg, and the trial testimony of three witnesses, Richard Price, CPA, Anthony Bryant, and the Defendant. Deposition testimony of the Defendant was also admitted into evidence.

This is a core proceeding. 28 U.S.C. § 157(b)(2)(I) (2006).

## I

Extreme Logistics, LLC is a limited liability company organized under the laws of the State of Tennessee on November 24, 2003. *See* TRIAL EX. 19. It was engaged in the trucking business, hauling loads for its customers. At the time it was organized and for some time thereafter, the Defendant served as secretary, while its sole member and chief executive officer was Joseph D. Brandenburg, the Defendant's husband. On January 7, 2003, Extreme Logistics, LLC entered into an Accounts Receivable Purchase Agreement (Factoring Agreement) with the Plaintiff through which the Plaintiff purchased all of Extreme Logistics, LLC's receivables arising in the ordinary course of business, was appointed sole factor for Extreme Logistics, LLC, and was granted a security

---

[1] Multiple continuances were necessitated by the criminal prosecution of the Defendant's husband, Joseph Brandenburg, a necessary witness. Mr. Brandenburg entered into a Plea Agreement in the United States District Court for the Eastern District of Tennessee on March 23, 2009, and was convicted of three counts of wire fraud, one count of money laundering, and one count of signing false tax returns on May 25, 2010. He is presently incarcerated in a federal penitentiary.

interest in substantially all of Extreme Logistics, LLC's assets. TRIAL EX. 20. Pursuant to the Factoring Agreement, Extreme Logistics, LLC generated and submitted invoices to the Plaintiff for the loads it hauled, and the Plaintiff then advanced the amounts reflected on the invoices, less factoring fees, to be repaid when Extreme Logistics, LLC's customers paid their respective invoices. In the event Extreme Logistics, LLC received any payments on a receivable directly from one of its customers, those payments were to be held in escrow and remitted to the Plaintiff. The initial term of the Factoring Agreement was one year, with automatic renewals for successive twelve month periods unless terminated by either party in writing.

At some point in time, Extreme Logistics, LLC, through Joseph Brandenburg, began pre-billing invoices for three of its dedicated and semi-dedicated runs, BMW, TNT, and Bowater News Print, wherein it submitted invoices for runs that had yet to be made and received payments from the Plaintiff. Mr. Brandenburg additionally submitted what were later determined to be false and invalid invoices, likewise receiving payment from the Plaintiff for those amounts. In early summer of 2005, Mr. Brandenburg met with the Plaintiff's representatives to try and fix the accounting problems created by the pre-billing as well as repay the Plaintiff on the improperly advanced monies. Nevertheless, funds totaling approximately $2,500,000.00 were not repaid, and in early March 2006, Extreme Logistics, LLC requested emergency funding from the Plaintiff. This request was denied when the nature and specifics of the emergency were not proved, and the Plaintiff stopped funding Extreme Logistics, LLC's Receivables. As a result of losing its cash flow, Extreme Logistics, LLC

ceased operations on March 9, 2006. On April 7, 2006, Mr. Brandenburg filed an individual Voluntary Petition under Chapter 7, commencing case number 06-30709.[2]

In early March 2006, the Defendant opened the following bank accounts with American Trust Bank of East Tennessee (American Trust Bank):

(1) commercial checking account #3001695 opened with an initial deposit of $100.00 via check on March 1, 2006, in the name of Extreme Logistics, LLC, authorizing as signatories Mr. Brandenburg as CEO and the Defendant as Secretary (Extreme Logistics Account);

(2) individual personal checking account #1006436 opened with an initial deposit of $100.00 via transfer on March 6, 2006, in the name of Ericka S. Brandenburg (Rikki Checking Account);

(3) individual personal savings account #60526 opened with an initial deposit of $100.00 via check on February 28, 2006, in the name of Ericka S. Brandenburg with a pay-on-death designation to Christa M. Brandenburg (Christa Savings Account);

(4) individual personal savings account #60527 opened with an initial deposit of $100.00 via check on March 1, 2006, in the name of Ericka S. Brandenburg with a pay-on-death designation to Dylan J. Brandenburg (Dylan Savings Account);

(5) joint personal checking account #1006290 opened with an initial deposit of $100.00 via check on February 28, 2006, in the names of Joseph D. Brandenburg and Ericka S. Brandenburg (Joey and Rikki Checking Account);

(6) commercial checking account #3001709 opened with an initial deposit of $100.00 on March 1, 2006, in the name of Extreme Logistics, LLC, Fuel Account, authorizing as signatories Mr. Brandenburg as CEO and the Defendant as Secretary (Fuel Account); and

(7) joint personal savings account #60525 opened with an initial deposit of $100.00 via check on February 28, 2006, in the name of Joseph D. Brandenburg and Ericka S. Brandenburg (Joey and Rikki Savings Account).

---

[2] Mr. Brandenburg and the Plaintiff entered into an Agreed Judgment on September 29, 2008, awarding the Plaintiff a nondischargeable judgment in the amount of $2,500,000.00 pursuant to 11 U.S.C. § 523(a)(2)(A). As noted, Mr. Brandenburg was criminally prosecuted and convicted for his actions. *See supra* n.1.

4

COLL. TRIAL EX. 9.[3] Following the cessation of Extreme Logistics, LLC's business, checks payable to Extreme Logistics, LLC in the aggregate amount of $133,899.10 were deposited into the Extreme Logistics Account,[4] with a total of $39,231.48 remitted to the Plaintiff as required under the Factoring Agreement. *See* TRIAL EX. 22; TRIAL EX. 50. By the present action, the Plaintiff seeks a nondischargeable judgment against the Defendant for the difference, $94,697.46.[5]

On July 2, 2007, the Defendant filed the Voluntary Petition commencing her Chapter 7 bankruptcy case. The Plaintiff timely filed the Complaint initiating this adversary proceeding, alleging that the Defendant knowingly deposited and used money that belonged to the Plaintiff, that as Secretary of Extreme Logistics, LLC, the Defendant almost exclusively controlled the bank accounts, and that as Secretary of Extreme Logistics, LLC, the Defendant owed a fiduciary duty to the Plaintiff under the Factoring Agreement. In response, the Defendant has argued that she was not an officer, owner, or employee of Extreme Logistics, LLC, which closed in March 2006, and that she did not execute any note or guaranty establishing a financial obligation to the Plaintiff.

---

[3] The Defendant also opened the following accounts with American Trust Bank which are not relevant to this adversary proceeding: (1) business checking account #3001830 with an initial deposit of $530.00 via check on May 16, 2006, in the name of Haven Assembly, with herself as the sole authorized signatory; (2) commercial checking account #3001679 opened with an initial deposit of $100.00 via check on March 1, 2006, in the name of Extreme Properties, LLC, authorizing as signatories Mr. Brandenburg as CEO, the Defendant as President, and Allan Shane McCool as Vice President; and (3) commercial checking account #3001687 opened with an initial deposit of $100.00 via check on March 1, 2006, in the name of West Side Logistics Corp., authorizing as signatories Mr. Brandenburg as CEO and the Defendant as Secretary. *See* COLL. TRIAL EX. 9.

[4] A total of $17,001.97 in deposits not related to Extreme Logistics, LLC's business were deposited into the various other non-Extreme Logistics, LLC accounts. *See* COLL. TRIAL EX. 22 at Page 2, Tab 2. These deposits consisted of the following: Mr. Brandenburg's earnings – $11,548.99; interest income – $77.68; Haven Ministries – $2,270.00; gifts – $1,260.00; miscellaneous – $545.30; and Debra Brandenburg – $1,300.00. Excluding transfers between the various American Trust Bank accounts, a total of $150,930.91 was deposited into the accounts after the business ceased operations, the majority of which, $133,899.10, was deposited into the Extreme Logistics Account.

[5] Subtracting the $39,231.48 payment from the $133,899.10 received yields a difference of $94,667.62. The judgment amount sought by the Plaintiff includes $29.84 which is addressed *infra* at footnote 10.

5

## II

The bankruptcy court possesses the jurisdiction and authority to adjudicate the Plaintiff's claims and award any necessary damages. *Haney v. Copeland (In re Copeland)*, 291 B.R. 740, 792 (Bankr. E.D. Tenn. 2003) (citing *Longo v. McLaren (In re McLaren)*, 3 F.3d 958, 965 (6th Cir. 1993)). The Plaintiff seeks a judgment against the Defendant in the amount of $94,697.46 as well as a determination that the judgment is nondischargeable, grounded on the following subsections of 11 U.S.C. § 523:

> (a) A discharge under section 727,[6] . . . of this title does not discharge an individual debtor from any debt—
>
> . . . .
>
> > (4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny; [or]
> >
> > . . . .
> >
> > (6) for willful and malicious injury by the debtor to another entity or to the property of another entity[.]

11 U.S.C. § 523(a).[7] The burden of proving each element necessary for a determination of nondischargeability by a preponderance of the evidence is borne by the Plaintiff, against which the court construes § 523(a) strictly, while construing it liberally in favor of the Defendant. *Grogan v.*

---

[6] Chapter 7 debtors receive a discharge of pre-petition debts, "[e]xcept as provided in section 523 of this title[.]" 11 U.S.C. § 727(b) (2005). This accomplishes the goals of Chapter 7 to relieve "honest but unfortunate" debtors of their debts and allow them a "fresh start" through this discharge. *Buckeye Retirement, LLC v. Heil (In re Heil)*, 289 B.R. 897, 901 (Bankr. E.D. Tenn. 2003) (quoting *In re Krohn*, 886 F.2d 123, 125 (6th Cir. 1989) (citing *Local Loan Co. v. Hunt*, 54 S.Ct. 695, 699 (1934))). The Order granting the Defendant's discharge was entered on December 19, 2007.

[7] In its Complaint, the Plaintiff also raised § 523(a)(2)(A) as a basis for a determination of nondischargeability; however, it did not pursue that claim at trial.

*Garner*, 111 S. Ct. 654, 661 (1991); *Rembert v. AT&T Universal Card Servs., Inc. (In re Rembert)*, 141 F.3d 277, 281 (6th Cir. 1998).

## A

Section 523(a)(4) allows a debt obtained by embezzlement, larceny, or through fraud or defalcation while acting in a fiduciary capacity to be nondischargeable. The Plaintiff first argues that the Defendant breached her fiduciary relationship with it by not depositing the funds into escrow and remitting them to the Plaintiff as required under the Factoring Agreement. Defalcation under § 523(a)(4) requires proof of: "1) a fiduciary relationship; 2) breach of that fiduciary relationship; and 3) a resulting loss." *R.E. Am., Inc. v. Garver (In re Garver)*, 116 F.3d 176, 178 (6th Cir. 1997). However, because "the debtor must hold funds in trust for a third party" in order to prove a fiduciary relationship, "the defalcation provision of § 523(a)(4) is limited to only those situations involving an express or technical trust relationship arising from placement of a specific res in the hands of the debtor." *Garver*, 116 F.3d at 179-80. The record here is clear that there was no actual trust existing between the parties and, under Sixth Circuit authority, the Plaintiff has not met its burden of proof with respect to that prong of § 523(a)(4).

The Plaintiff also argues that it is entitled to a nondischargeable judgment under the embezzlement prong. For purposes of § 523(a)(4), embezzlement is defined as "the fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands

it has lawfully come." *Brady v. McAllister (In re Brady)*, 101 F.3d 1165, 1172-73 (6th Cir. 1996).[8] Embezzlement is demonstrated by proof that the creditor entrusted property to the debtor who then appropriated it for a use other than the entrusted use, and the circumstances indicate fraud. *See Bd. of Trs. v. Bucci (In re Bucci)*, 493 F.3d 635, 644 (6th Cir. 2007) (citing *Brady*, 101 F.3d at 1173); *Cash Am. Fin. Servs., Inc. v. Fox (In re Fox)*, 370 B.R. 104, 116 (B.A.P. 6th Cir. 2007). A finding of embezzlement does not, however, require the existence of a fiduciary relationship. *Jones v. Hall (In re Hall)*, 295 B.R. 877, 882 (Bankr. W.D. Ark. 2003).

To prove fraudulent misappropriation, the Plaintiff must prove "'fraud in fact, involving moral turpitude or *intentional* wrong.'" *Fox*, 370 B.R. at 116 (quoting *Driggs v. Black (In re Black)*, 787 F.2d 503, 507 (10th Cir. 1986)). "Both the intent and the actual misappropriation necessary to prove embezzlement may be shown by circumstantial evidence." *WebMD Servs., Inc. v. Sedlacek (In re Sedlacek)*, 327 B.R. 872, 880 (Bankr. E.D. Tenn. 2005) (quoting *Goodmar, Inc. v. Hamilton (In re Hamilton)*, 306 B.R. 575, 582 (Bankr. W.D. Ky. 2004)). "The fraud element may also be satisfied by a showing of deceit . . . [and] intent can be inferred from the relevant circumstances." *Powers v. Powers (In re Powers)*, 385 B.R. 173, 179-80 (Bankr. S.D. Ohio 2008). "[M]isrepresentations, omissions, or other concealment of a debtor's actions regarding a creditor's property are important circumstances that might pierce the shadows to illuminate a debtor's fraudulent intent[,]" but a finding that the creditor relied upon the debtor's misrepresentation is not required. *Fox*, 370 B.R. at 116-17. Additionally, fraudulent intent may be negated by evidence that

---

[8] Larceny under § 523(a)(4) is proved if the debtor wrongfully and with fraudulent intent takes property from its rightful owner, *see Great Am. Ins. Co. v. O'Brien (In re O'Brien)*, 154 B.R. 480, 483 (Bankr. W.D. Tenn. 1993) (citing *Kaye v. Rose (In re Rose)*, 934 F.2d 901, 903 (7th Cir. 1991)), and differs from embezzlement because the embezzler's initial acquisition of the property at issue is lawful. *Aristocrat Lakewood Nursing Home v. Dryja (In re Dryja)*, 259 B.R. 629, 632 (Bankr. N.D. Ohio 2001).

8

the debtor did not conceal use of the property or that the misappropriation was to benefit the debtor's business rather than to harm the creditor. *Fox*, 370 B.R. at 117.

Based upon the record, the court finds that the Plaintiff has established that the Defendant was entrusted with the Plaintiff's property which she fraudulently appropriated for uses other than its intended one. Pursuant to the Factoring Agreement,

> 2.1     Client [Extreme Logistics, LLC] agrees to use and hereby appoints PFS [the Plaintiff] as its sole factor. Client hereby conveys, transfers, assigns and sells to PFS as absolute owner thereof all right, title and interest of its present and future Receivables.[9] Receivables shall be deemed acceptable for assignment in PFS's sole, absolute and unlimited discretion, and such acceptance shall be expressly communicated to Client by PFS. Client further grants, conveys, transfers, sells and assigns to PFS all of its interest in the goods or services sold by Client which gave rise to the Receivables, in all goods that may be returned by Customers; all Client's rights as an unpaid vendor or lienor; documents (including, without limitation) all Client's bills of lading; all Client's proof of delivery; all Client's contracts and contract rights (including, without limitation, all Client's rights in purchase orders in the assets sold and assigned); all Client's rights of stoppage in transit, replevin and reclamation relating thereto; all Client's rights in and the guarantees thereof, and all Client's rights against related third parties thereto. Any goods so recovered or returned shall be set aside, and held in trust for PFS and such property shall be deemed the sole property of PFS. Client shall notify PFS promptly of all such returned or recovered goods.
>
> . . . .
>
> 2.4     If any remittance or payment for a Receivable is made directly to Client by or on behalf of a Customer, Client shall hold such amounts in escrow for PFS and such amounts shall be deemed the sole property of PFS. Upon receipt of any such remittance or payment, Client shall immediately deliver to PFS the identical checks, monies or other forms of payment received and PFS shall have the right to endorse Client's name on all such remittances.

---

[9] Receivables is defined by the Factoring Agreement as "collectively or severally all accounts, contract rights, notes, bills and other forms of obligation arising in the ordinary course of business conducted by Client from the sale of goods or rendition of services." TRIAL EX. 20 at ¶ 1.11.

9

TRIAL EX. 20. Unquestionably, under the Factoring Agreement, all Receivables were the sole property of the Plaintiff, and although Extreme Logistics, LLC would have come into possession of payments based on previously billed invoices at the time its business was closing in March 2006, it was not the owner of those funds, and use thereof in any way other than remittance to the Plaintiff was misappropriation.

As previously stated, Extreme Logistics, LLC ceased doing business on March 9, 2006. Following that date, payments totaling $130,130.25 attributable to Receivables belonging to the Plaintiff were received by Extreme Logistics, LLC. Of this amount, deposits totaling $115,490.25 were made into the Extreme Logistics Account as follows: (1) March 10, 2006, in the amount of $14,979.40 received from Koyo; (2) March 16, 2006, in the amount of $12,200.89 received from Koyo; (3) March 21, 2006, in the amount of $6,960.71 received from Koyo; (4) March 22, 2006, in the amount of $11,377.40 received from TAMKO Roofing Products; (5) April 7, 2006, in the amount of $11,829.74 received from Canawill; (6) April 25, 2006, in the amount of $18,910.63 received from AFCO Credit Corporation; and (7) May 10, 2006, in the amount of $39,231.48 received from Barksdale Bonding. COLL. TRIAL EX. 1; TRIAL EX. 50.[10] Of that amount, only

---

[10] Additional checks payable to Extreme Logistics, LLC totaling $3,768.85 were deposited into the Extreme Logistics Account on March 20, 2006, in the amount of $439.35 received from Walt M. Williams, Inc. for the purchase of a vehicle, on March 31, 2006, in the amount of $5.50 from Ford Motor Credit Company for an unknown purpose, and on April 7, 2006, in the amount of $3,324.00 from John P. Newton, Attorney, for reimbursement of legal fees. COLL. TRIAL EX. 1; TRIAL EX. 50. These checks and payments, however, do not fall within the definition of "Receivables" in the Factoring Agreement, are not "the sole property of PFS," and do not meet the requirements for a finding of embezzlement under § 523(a)(4). TRIAL EX. 20. Collective Trial Exhibit 1 also reflects that a check in the amount of $6,464.96 from Pilot Travel Centers, LLC was deposited into the Extreme Logistics, LLC account on March 31, 2006; however, payment on this check was stopped, thus, it was not included within Mr. Price's analysis or the Plaintiff's requested damages, and it has therefore been excluded from the court's analysis as well. See COLL. TRIAL EX. 14. Another check dated March 27, 2006, payable jointly to the Defendant and Mr. Brandenburg in the amount of $29.84 from Liberty Mutual was deposited on April 3, 2006, to an account at the ORNL Federal Credit Union. This check was included by Mr. Price in his analysis but, because the court finds insufficient proof thereon, this amount was likewise
(continued...)

10

$39,231.48 was paid to the Plaintiff as required by the Factoring Agreement through turnover of the Barksdale Bonding funds. The remaining $14,640.00 attributable to Receivables is represented by a check payable to Extreme Logistics, LLC in early to mid-March 2006 from TAMKO. Rather than deposit this check to the Extreme Logistics Account, Mr. Brandenburg endorsed the check to the Bosch Law Firm, P.C. on March 16, 2006, in partial payment of legal fees related to the defense of his criminal proceeding. The Bosch Law Firm, P.C. subsequently determined that these funds should be replaced with funds from an outside source not related to Extreme Logistics, LLC. To that end, the Defendant issued a check in the amount of $14,640.00 from the Rikki Account payable to Don Bosch on April 20, 2006. After this check cleared the Rikki Account, the Bosch Law Firm, P.C. issued its check for $14,640.00 on April 25, 2006, payable to Joey Brandenburg, which was deposited into the Rikki Account on April 28, 2006. Although originally endorsed to the Bosch Law Firm, P.C., the $14,640.00 received from TAMKO clearly constituted a Receivable belonging to the Plaintiff which should have been deposited in the Extreme Logistics Account. *See* TRIAL EX. 26; COLL. TRIAL EX. 2 at pp. 69, 92-95.

The Defendant testified in her deposition and acknowledged at trial that she paid a total of $39,930.86 towards personal family expenses, including such things as the mortgage, car payments, groceries, home improvement, credit card payments, and clothing. COLL. TRIAL EX. 23; *see also* COLL. TRIAL EX. 22 at Tab 3. She also acknowledged that she wrote checks totaling $5,150.00 and $8,591.42 payable to herself and her husband, respectively, and that approximately $33,287.67 was

---

[10](...continued)
not included in the court's analysis.

11

used to pay outstanding insufficient funds checks and legal fees for Mr. Brandenburg. COLL. TRIAL EX. 23; *see also* COLL. TRIAL EX. 22 at Tabs 1, 4-5.

In her defense, the Defendant argued that she had not entered into any agreement with the Plaintiff and she, therefore, could not be held responsible for the monies not paid by Extreme Logistics, LLC to the Plaintiff. She also argued that she simply followed her husband's instructions regarding making deposits, transferring money between accounts, and writing checks from the Extreme Logistics Account, and that she was unaware the Receivables paid to Extreme Logistics, LLC belonged to the Plaintiff and could not be used otherwise.

There is no dispute that the Factoring Agreement was between the Plaintiff and Extreme Logistics, LLC and was executed by Mr. Brandenburg on behalf of the company as its sole member and chief executive officer. Nevertheless, the Defendant was, in fact, the secretary of Extreme Logistics, LLC when it was organized, and she continued to hold herself out in that role as late as March 1, 2006, when she executed the Limited Liability Company Authorization Resolution attached to the account certifications for the Extreme Logistics Account. COLL. TRIAL EX. 1; COLL. TRIAL EX. 9. More significantly, the Defendant acknowledged in her trial testimony that she made the majority, if not all, of the deposits of customer check Receivables into the Extreme Logistics Account after opening the account in March 2006. The record clearly establishes that the Defendant wrote all but one of the checks and requested each withdrawal paid out of the Extreme Logistics Account. COLL. TRIAL EX. 1; COLL. TRIAL EX. 11.

Under Tennessee law, "[n]otwithstanding the provisions of subdivisions (a)(1) and (a)(2) [that "a member, . . . employee or other agent of an LLC does not have any personal obligation and is not otherwise personally liable for the acts, debts, liabilities, or obligations of the LLC" or "for the acts or omissions of any other member, . . ., employee or other agent of the LLC], a member . . ., employee or other agent may become personally liable in contract, tort or otherwise by reason of such person's own acts or conduct." TENN. CODE ANN. § 48-217-101(a)(3) (2002). Notwithstanding the testimony to the contrary by the Defendant and Mr. Brandenburg, by holding herself out to American Trust Bank as an officer of Extreme Logistics, LLC with the express authorization of Mr. Brandenburg, the sole member of the company, the Defendant acted as an agent of Extreme Logistics, LLC, and she is liable to the Plaintiff for any tortuous or fraudulent conduct against it while in that role. *See, e.g., Wilson v. Wayne County*, 856 F. Supp. 1254, 1264 (M.D. Tenn. 1994) ("'Principal and agent can be joined in one action for a wrong resulting from the tortious conduct of an agent . . . and a judgment can be rendered against each.'") (quoting RESTATEMENT (SECOND) OF AGENCY §§ 359C(1) (1957)); *Brungard v. Caprice Records, Inc.*, 608 S.W.2d 585, 590 (Tenn. Ct. App. 1980) ("[A]n agent cannot escape liability for tortious acts, including fraud or misrepresentation, against third persons simply because the agent was acting within the scope of the agency or at the direction of the employer.").

The Defendant's testimony that she did not know the Plaintiff had an interest in the customers' checks received by Extreme Logistics, LLC or that the Plaintiff only had an interest in invoices it factored and checks it received directly is not credible. She had been employed by Extreme Logistics, LLC until 2004, and she had experience in the trucking business, working for

Knox Fleet in Transportation Services prior to Extreme Logistics, LLC. She testified that she understood how factoring worked, and even though she did not personally deal with the Plaintiff, she had previously dealt with another factoring company, Bayview Funding, before Extreme Logistics, LLC entered into the Factoring Agreement with the Plaintiff. Moreover, the record clearly reflects that it was the Defendant who maintained the Extreme Logistics Account, and it is immaterial whether she knew that checks being deposited into the account actually belonged to the Plaintiff. The Defendant at the very least understood that the checks belonged to Extreme Logistics, LLC when she used those monies to pay for personal expenses, and it is disingenuous for her to claim that she was simply following her husband's instructions.

Although it is impossible to track 100% of the funds deposited, withdrawn, paid out, or transferred between the American Trust Bank accounts, it is nevertheless easily discernable that the Defendant took the funds belonging to the Plaintiff and did not pay them to the Plaintiff, instead using them for other – primarily personal – purposes. The Extreme Logistics Account was opened on March 1, 2006, with a deposit of $100.00, followed by a deposit on March 10 of the $14,979.40 Koyo check, yielding a balance of $15,079.40. COLL. TRIAL EX. 1. On that same date, the Defendant wrote three checks: (1) in the amount of $4,900.00 payable to American Trust with a memo for Michelle Reynolds, a foster child of the Defendant's; (2) in the amount of $4,950.00 to Rikki Brandenburg with a memo for driver payroll; and (3) in the amount of $5,000.00 with an illegible memo, leaving a balance of $229.40. COLL. TRIAL EX. 1. On March 16, the Defendant deposited a second payment from Koyo, in the amount of $12,200.89 then made a checking withdrawal of $12,200.00, leaving a balance of $230.29. COLL. TRIAL EX. 1. On March 21, the

14

Defendant made a deposit of $6,960.71 for another check received from Koyo, and on that same day, presented one check to American Trust in the amount of $2,179.81 for "Ford Credit cashier's check fee" and a second check in the amount of $5,000.00 to Joey Brandenburg. COLL. TRIAL EX. 1. On March 22, the Defendant made a deposit in the amount of $11,377.40 for a payment received from TAMKO Roofing Products, and the balance in the Extreme Logistics Account was $11,827.94. COLL. TRIAL EX. 1. Thereafter, on March 28, the Defendant wrote a check to Joey Brandenburg in the amount of $8,000.00, and on March 28, she wrote a check, which was signed by Mr. Brandenburg, in the amount of $3,324.00 to John P. Newton, Jr., leaving the Extreme Logistics Account with an ending balance of $503.94 for March. COLL. TRIAL EX. 1.

On April 3, the Defendant deposited a check from Pilot Travel Centers, LLC in the amount of $6,464.96 and a check from Ford Motor Credit in the amount of $5.50, then made a cash withdrawal on April 4 of $6,900.00, leaving $74.40 in the Extreme Logistics Account. COLL. TRIAL EX. 1. Deposits were made on April 6 and 7, totaling $9,788.96, representing a cashier's check payable to the Defendant in the amount of $6,464.96 to cover the return item debit of the Pilot Travel Centers, LLC check, upon which payment had been stopped, and a $3,324.00 check from John P. Newton, Attorney. COLL. TRIAL EX. 1. Also on April 7, the Defendant deposited a check in the amount of $11,829.74 received from Canawill before making a cash withdrawal of $3,324.00. COLL. TRIAL EX. 1. Thereafter, on April 17, the Defendant transferred $11,874.14 to the Rikki Checking Account, leaving a $25.00 balance in the Extreme Logistics Account. COLL. TRIAL EX. 1; COLL. TRIAL EX. 2. Finally, on April 25, the Defendant deposited $18,910.63 received from AFCO Credit

15

Corporation, and the ending balance in the Extreme Logistics Account for April was $18,935.63. COLL. TRIAL EX. 1.

On May 4, however, the Defendant transferred $18,900.00 to the Christa Savings Account, of which $18,860.00 was either transferred to the Rikki Checking Account or included in a savings withdrawal made by the Defendant between May 16 and May 31, 2006. COLL. TRIAL EX. 1; COLL. TRIAL EX. 2; COLL. TRIAL EX. 5. Also, on May 10, the Defendant deposited a $39,231.48 check received from Barksdale Bonding into the Extreme Logistics Account, all of which was then transferred on May 22 to the Dylan Savings Account, leaving $36.11 in the Extreme Logistics Account, which was then withdrawn on July 3, zeroing out the account. COLL. TRIAL EX. 1; COLL. TRIAL EX. 6. On May 22, the Defendant transferred $2,500.00 from the Dylan Savings Account to the Rikki Checking Account, followed by a savings withdrawal on June 8 in the amount of $4,075.88. COLL. TRIAL EX. 6. Additional transfers of $350.00 and $1,400.00, respectively, were made to and from the Rikki Checking Account and the Joey and Rikki Checking account on June 26, 27, and 30, leaving a $42,822.90 ending balance on July 2, after payment of interest. COLL. TRIAL EX. 6. On July 7, the Defendant made a savings withdrawal of the entire balance and obtained a cashier's check to the Plaintiff in the amount of $39,231.48 and a cashier's check in the amount of $3,591.42 to Joey Brandenburg. COLL. TRIAL EX. 6.

As previously stated, the Defendant identified during her deposition checks that she wrote for personal expenses totaling $39,930.86, checks that she wrote payable to herself totaling $5,150.00, checks that she wrote payable to her husband totaling $8,591.42, and bad checks that she paid on behalf of her husband totaling $33,287.67. COLL. TRIAL EX. 23; *see also* COLL. TRIAL

16

Ex. 22 at Tabs 1, 3-5. Additionally, in his report, Mr. Price identified, through his review of the bank account records for all of the American Trust Bank accounts, unaccounted for cash withdrawals totaling $6,698.55 and legal fees paid to Don Bosch totaling $22,140.00. COLL. TRIAL EX. 22 at Tab 5. Based upon the record, it is undisputed that the Defendant made deposits totaling $115,490.25 that should have been held in escrow and turned over to the Plaintiff but were instead deposited into the Extreme Logistics Account. She also issued a $14,460.00 check from the Rikki Account to Don Bosch which represented the disbursement of the proceeds of a check received from TAMKO in March 2006 that should have been deposited into the Extreme Logistics Account and remitted to the Plaintiff. It is also clear that the Defendant wrote and signed all but one of the checks written out of the Extreme Logistics Account,[11] and she was also the person who caused the transfers and deposits of money from the Extreme Logistics Account to the personal checking and savings accounts she had created at American Trust Bank, from which she then paid personal expenses. The Defendant's actions, as an agent of Extreme Logistics, LLC, constitute fraudulent misappropriation of the Plaintiff's property. After applying the $39,231.48 remitted to the Plaintiff on July 7, 2006, the court finds that the Plaintiff is entitled to a judgment in the amount of $90,898.77 which is nondischargeable under § 523(a)(4) for embezzlement.

**B**

Likewise, the court finds that the judgment awarded the Plaintiff is nondischargeable under § 523(a)(6) for conversion. In order to prevail under § 523(a)(6), a plaintiff must prove the existence

---

[11] The lone check signed by Mr. Brandenburg was a March 28, 2006 check payable in the amount of $3,324.00 to John P. Newton, Jr. *See* COLL. TRIAL EX. 1.

of "a deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury[,]" *Kawaauhau v. Geiger*, 118 S. Ct. 974, 977 (1998) and that the defendant either desired to cause the consequences of her actions or believed with reasonable certainty that such consequences would occur. *Markowitz v. Campbell (In re Markowitz)*, 190 F.3d 455, 464 (6th Cir. 1999). "That a reasonable debtor 'should have known' that his conduct risked injury to others is simply insufficient. Instead, the debtor must 'will or desire harm, or believe injury is substantially certain to occur as a result of his behavior.'" *Guthrie v. Kokenge (In re Kokenge)*, 279 B.R. 541, 543 (Bankr. E.D. Tenn. 2002) (quoting *Markowitz*, 190 F.3d at 465 n.10). Additionally, "the injury must invade the creditor's legal rights." *Steiner v. Best (In re Best)*, 109 Fed. Appx. 1, 6 (6th Cir. 2004). Accordingly, based upon Sixth Circuit authority, "unless 'the actor desires to cause consequences of his act, or . . . believes that the consequences are substantially certain to result from it,' he has not committed a 'willful and malicious injury' as defined under § 523(a)(6)." *Markowitz*, 190 F.3d at 464; *Kokenge*, 279 B.R. at 543 (citations omitted).

"Although the 'willful' and 'malicious' requirements will be found concurrently in most cases, the terms are distinct, and both requirements must be met under § 523(a)(6)." *S. Atlanta Neurology & Pain Clinic, P.C. v. Lupo (In re Lupo)*, 353 B.R. 534, 550 (Bankr. N.D. Ohio 2006). "An act will be deemed 'willful' only if it was undertaken with the actual intent to cause injury," *Cash Am. Fin. Servs. v. Fox (In re Fox)*, 370 B.R. 104, 119 (B.A.P. 6th Cir. 2007), requiring the court to "look into the debtor's mind, subjectively" in order to determine whether the "debtor intended to cause the consequences of his act or believed that the consequences were substantially certain to result from his act[.]" *Monsanto Co. v. Wood (In re Wood)*, 309 B.R. 745, 753 (Bankr. W.D. Tenn.

18

2004). On the other hand, "[a]n act is 'malicious' if it is undertaken 'in conscious disregard of one's duties or without just cause or excuse' . . . [and does] 'not require ill-will or specific intent to do harm.'" *Fox*, 370 B.R. at 119 (quoting *Wheeler v. Laudani*, 783 F.2d 610, 615 (6th Cir. 1986)). "The conduct must 'be more culpable than that which is in reckless disregard of creditors' economic interests and expectancies, as distinguished from . . . legal rights. [K]nowledge that legal rights are being violated is insufficient to establish malice . . . .'" *Best*, 109 Fed. Appx. at 6 (quoting *In re Mulder*, 306 B.R. 265, 270 (Bankr. N.D. Iowa 2004)). In other words, "[l]ack of excuse or justification for the debtor's actions will not alone make a debt nondischargeable under § 523(a)(6)." *Lupo*, 353 B.R. at 550. Nondischargeability under § 523(a)(6) requires proof that the Plaintiff was injured and the Defendant's deliberate or intentional actions caused its injury, but "[m]ere negligence is not sufficient to except a debt from discharge under § 523(a)(6)." *Fox*, 370 B.R. at 119.

Acts of conversion may serve the basis for a determination of nondischargeability under § 523(a)(6). Under Tennessee law, conversion "is the appropriation of tangible property to a party's own use and benefit in exclusion of defiance of the owner's rights." *Thompson v. Thompson*, 2009 Tenn. App. LEXIS 99, at *45, 2009 WL 637289, at *14 (Tenn. Ct. App. Mar. 12, 2009); *see also Mammoth Cave Prod. Credit Ass'n v. Oldham*, 569 S.W.2d 833, 836 (Tenn. Ct. App. 1977) (defining conversion as an intentional tort requiring proof that a party appropriated another's property for his own use by exercising dominion and control in exclusion or defiance of the owner's right to use and benefit from the property). "The main focus of the tort is the interference with an owner's property right[ and t]he degree of this interference, as well as the impact on the property, determines whether there has been a conversion." *Gen. Elec. Credit Corp. v. Kelly & Dearing*

19

*Aviation*, 765 S.W.2d 750, 753 (Tenn. Ct. App. 1988). "[W]hile they do appreciably overlap, liability for conversion does not automatically equate with the existence of a nondischargeable debt under § 523(a)(6)." *Superior Metal Prods. v. Martin (In re Martin)*, 321 B.R. 437, 441 (Bankr. N.D. Ohio 2004). Whether an act of conversion constitutes a willful and malicious injury within the scope of § 523(a)(6) depends upon whether the party intended to cause the harm or was substantially certain that such harm would occur. *Sweeney v. Lombardi (In re Lombardi)*, 263 B.R. 848, 853 (Bankr. S.D. Ohio 2001).

Having previously found that the Defendant fraudulently misappropriated the Plaintiff's property, and in light of the degree to which she transferred funds between accounts and spent the money on personal expenses and bills in conscious disregard to the Plaintiff's rights therein, the court also finds that the Defendant converted the funds under applicable Tennessee and bankruptcy law, whereby the $90,898.77 judgment awarded the Plaintiff is also nondischargeable under § 523(a)(6).

A Judgment consistent with this Memorandum will be entered.

FILED:  March 3, 2011

> BY THE COURT
>
> */s/  RICHARD STAIR, JR.*
>
> RICHARD STAIR, JR.
> UNITED STATES BANKRUPTCY JUDGE